1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARK HOVILA,

         Plaintiff,

   v.

TWEEN BRANDS, INC.,

         Defendant.

Case No.  C09-0491RSL

ORDER GRANTING IN PART
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

15
16
17
18
19
20
21
22
23
24
25
26
27
28

      This matter comes before the Court on defendant's motion for summary judgment.  Dkt.
# 11.  Plaintiff claims that pre-recorded telephone messages initiated by defendant violated the
Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, and the Washington
Automatic Dialing and Answering Devices Act ("WADAD"), RCW 80.36.400.  Defendant
argues that the telephone calls at issue were permissible under the TCPA and that the WADAD
does not apply or is preempted by the federal statute.  Defendant further argues that plaintiff
consented to the calls under both the TCPA and the WADAD.  For the reasons discussed below,
the Court GRANTS defendant's motion for summary judgment with regard to plaintiff's TCPA
claim and DENIES defendant's motion with regard to plaintiff's WADAD claim.

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT       - 1 -

1

**BACKGROUND**

2     Tween Brands, Inc., operates retail apparel stores, one of which is the Limited Too, a
3 store specializing in apparel and accessories for girls ages seven through fourteen.  On more than
4 one occasion, plaintiff purchased merchandise from a Limited Too store in the Alderwood Mall.
5 Plaintiff's credit card statements confirm purchases in 2007 and 2008.
6     Tween Brands uses prerecorded telephone calls to keep in contact with its customers.
7 Between November 17, 2007, and December 26, 2008, plaintiff received pre-recorded telephone
8 calls at his residence from an outside vendor on behalf of the Limited Too.  The calls originated
9 from outside the State of Washington.  The parties do not dispute that pre-recorded calls were
10 placed to plaintiff on behalf of defendant.

11

**SUMMARY JUDGMENT STANDARD**

12     Summary judgment is appropriate when, viewing the facts in the light most favorable to
13 the nonmoving party, there is no genuine issue of material fact that would preclude summary
14 judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party seeking summary dismissal of the
15 case "bears the initial responsibility of informing the district court of the basis for its motion."
16 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has satisfied its
17 burden, it is entitled to summary judgment if the non-moving party fails to designate, by
18 affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing
19 that there is a genuine issue for trial."  Id. at 324.  "Summary judgment should be granted where
20 the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict
21 in its favor."  Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual
22 disputes the resolution of which would not affect the outcome of the suit are irrelevant to the
23 consideration of a motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S.
24 242, 248 (1986).

25

26

27 ORDER GRANTING IN PART DEFENDANT'S
   MOTION FOR SUMMARY JUDGMENT          - 2 -
28

1

**DISCUSSION**

2

**A.  Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.***

3       The TCPA prohibits the use of automatic dialing and announcing devices without the

4   prior express consent of the recipient.  Defendant argues that its telephone calls to plaintiff were

5   permissible because it had an existing business relationship ("EBR") with plaintiff.  Plaintiff

6   argues that defendant cannot rely on the EBR exemption to the general ban on the use of

7   automatic dialing and announcing devices for at least three reasons: 1) the EBR exemption

8   contravenes the plain language of the TCPA; 2) the Federal Communication Commission

9   ("FCC")  did not have authority to conclude that an EBR implies consent to the call; and 3) the

10  EBR exemption is contrary to the intent of Congress as evidenced by the passage of the 2005

11  Junk Fax Prevention Act ("JFPA").

12       **1. Language of the TCPA**

13       Under the TCPA, it is:

14       unlawful for any person . . . to initiate any telephone call to any residential telephone
         line using an artificial or prerecorded voice to deliver a message without the prior
15       express consent of the called party, unless the call is initiated for emergency purposes
         or is exempted by rule or order by the [Federal Communications] Commission under
16       paragraph (2)(B).

17

18  47 U.S.C. § 227(b)(1)(B).  A plain reading of this provision indicates that automated messages

19  are prohibited without the prior express consent of the recipient *unless* the call falls into one of

20  two categories: 1) the call is initiated for emergency purposes; or 2) the call is exempted by rule

21  or order of the FCC.  Based on the rules of grammar and the common definition of "unless,"

22  Perrin v. United States, 444 U.S. 37, 42 (1979), these two categories describe exceptions to the

23  general rule requiring prior express consent before placing an artificial or prerecorded call.  The

24  plain language of the TCPA does not require prior express consent where either exception

25  applies.  Since the EBR exemption falls within the second exception to § 227(b)(1)(B), the EBR

26  exemption does not contravene the plain language of the TCPA.

27  ORDER GRANTING IN PART DEFENDANT'S
    MOTION FOR SUMMARY JUDGMENT          - 3 -
28

1          **2. FCC Authority**

2          Plaintiff argues that the EBR exemption is nonetheless invalid because the TCPA requires

3   express consent and Congress did not give the FCC authority to conclude that implied consent

4   through the existence of an EBR is sufficient.  Plaintiff argues that because the FCC's regulation

5   contradicts the TCPA's explicit requirements, the Court should afford it no deference.

6          As discussed above, the prior express consent requirement is separate from the provision

7   authorizing other FCC-made exemptions.  There is no requirement that the FCC include within

8   its rules or orders an express consent provision.  Instead, Congress provided that the FCC:

9          may, by rule or order, exempt from the requirements of paragraph (1)(B) . . . such
           classes or categories of calls made for commercial purposes as the [FCC] determines
10         – (I) will not adversely affect the privacy rights that this section is intended to protect;
           and (II) do not include the transmission of any unsolicited advertisement.
11

12   47 U.S.C. § 227(b)(2)(B)(ii).  The TCPA defines an "unsolicited advertisement" as "any

13   material advertising the commercial availability or quality of any property, goods, or services

14   which is transmitted to any person without that person's prior express invitation or permission,

15   in writing or otherwise."  47 U.S.C. § 227(a)(5).  The TCPA does not define the phrase "prior

16   express invitation or permission."

17          In § 227(b)(2)(B)(ii), Congress grants the FCC authority to establish the parameters of

18   "privacy rights" and, consistent with the statutory definition, "unsolicited advertisements" within

19   the context of developing exemptions from the ban on automated messages.  The necessary

20   implication is that the FCC also has the authority to determine what constitutes "prior express

21   invitation or permission" in this context.  See Chevron, U.S.A. v. Natural Resources Defense

22   Council, Inc., 467 U.S. 837, 843-44 (1984) (where "Congress has explicitly left a gap for the

23   agency to fill, there is an express delegation of authority to the agency to elucidate a specific

24   provision of the statute by regulations.").  Under Chevron, the FCC's attempt to define "prior

25   express invitation or permission" is a valid exercise of the agency's authority.

26          In relevant part, the EBR exemption provides:

27   ORDER GRANTING IN PART DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT          - 4 -
28

No person or entity may . . . [i]nitiate a telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call . . . [i]s made to any person with whom the caller has an established business relationship at the time the call is made . . .

47 C.F.R. § 64.1200(a)(2)(iv).  FCC regulations define an EBR as:

a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(f)(4).  The Court must view the FCC's interpretation of "prior express invitation or permission" as controlling unless it is arbitrary, capricious, or manifestly contrary to the statute.  Chevron, 467 U.S. at 844.  The Court will not disturb the FCC's reasonable interpretation of a statutory provision which the agency has the power to administer.  Id.

As noted above, the language of the TCPA does not preclude an EBR exemption and instead leaves to the FCC the interpretation of "prior express invitation or permission."  The legislative history of the TCPA supports the FCC's interpretation and the balance the agency struck between privacy and business interests.  Congress specifically noted that "an enterprise having an 'existing business relationship' with a subscriber should be permitted to solicit the subscriber even if the subscriber otherwise objected to unsolicited calls."  H.R. Rep. No. 102-317, at 14.  Congress also suggested that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."  H.R. Rep. No. 102-317, at 13.

Finally, the FCC's process supports the conclusion that its interpretation of "prior express invitation or permission" in the context of the EBR exemption is reasonable.  The FCC went through full notice-and-comment rulemaking in defining the EBR exemption, and the agency

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          - 5 -

1  considered and responded to both customer and industry concerns.  See Notice of Proposed

2  Rulemaking, 7 F.C.C.R. 2736, 2738 (1992); Rules and Regulations Implementing the Telephone

3  Consumer Protection Act of 1991, 7 F.C.C.R. 8752, 8769-71 (1992).  See also Notice of

4  Proposed Rulemaking and Memorandum Opinion and Order, 17 F.C.C.R. 17459, 17479-81

5  (2002); Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA)

6  of 1991, 68 Fed. Reg. 44144, 44167-68 (July 25, 2003).  In crafting the EBR exemption, the

7  FCC recognized that Congress did not intend to "foreclose the capacity of businesses to place

8  calls that build upon, follow up, or renew, within a reasonable period of time, what had once

9  been 'existing customer relationship.'" H.R. Rep. No. 102-317, at 15 (1991).  The FCC also

10  incorporated into the exemption provisions that protect consumer privacy, such as a requirement

11  that the communication be voluntary, an express time limitation, and a provision for customer

12  termination of the relationship.  See 47 C.F.R. § 64.1200(f)(4).

13      For the foregoing reasons, the Court finds that the FCC exercised valid authority in

14  adopting its EBR exemption and that the FCC's interpretation of "prior express invitation or

15  permission" within the context of the EBR exemption is reasonable.

16      **3.  EBR Exemption for Commercial Telephone Calls and the JFPA**

17      Plaintiff argues that the 2005 enactment of the Junk Fax Prevention Act ("JFPA") shows

18  that the EBR exemption is contrary to the intent of Congress.  The JFPA amended the TCPA by

19  including an express EBR exemption for unsolicited advertisements transmitted by telephone

20  facsimile ("fax") machines.  See 47 U.S.C. § 227(b)(1)(C)(I).  Congress did not, however,

21  include an EBR exemption for telephone calls placed to residential telephones using an artificial

22  or pre-recorded voice to deliver a message.  Plaintiff argues that this omission proves that

23  Congress did not intend to have an EBR exemption for telephone calls to residences using an

24  artificial or pre-recorded voice.

25      While it is true that, "[w]here Congress includes particular language in one section of a

26  statute but omits it in another section of the same Act, it is generally presumed that Congress

27  ORDER GRANTING IN PART DEFENDANT'S
   MOTION FOR SUMMARY JUDGMENT      - 6 -

28

1  acts intentionally and purposely in the disparate inclusion or exclusion" (<u>Russello v. United</u>

2  <u>States</u>, 464 U.S. 16, 23 (1983)), the JFPA's legislative history indicates that Congress did not

3  intend its inclusion of an EBR exemption for faxes as a comment, much less a prohibition, on the

4  FCC's EBR exemption for commercial telephone calls.  The 1991 TCPA granted the FCC

5  authority to establish exemptions regarding commercial telephone calls (47 U.S.C.

6  § 227(b)(1)(B)), but did not grant the FCC "discretion to create exemptions from . . . the

7  prohibition [on junk faxes]" (<u>Rules and Regulations Implementing the Telephone Consumer</u>

8  <u>Protection Act of 1991</u>, 7 F.C.C.R. at 8779 n. 87).  Nevertheless, the FCC's original order

9  establishing rules that implemented the TCPA's junk fax prohibition contained a footnote

10  recognizing "that facsimile transmission from persons or entities who have an established

11  business relationship with the recipient can be deemed to be invited or permitted by the

12  recipient."  <u>Id</u>.  Although the footnote was not published in the Code of Federal Regulations,

13  many businesses relied on the footnote and, from 1992 through July 2003, the FCC enforced the

14  TCPA junk fax provisions as if there were an EBR exemption.  S. Rep. No. 109-76, at 1 (2005).

15      In 2003, the FCC updated its rules regarding the TCPA and reversed its position on the

16  EBR exemption for junk faxes, citing cost concerns for fax recipients.  <u>Id</u>. at 2-3.  The updated

17  rule proposed requiring parties who sent unsolicited advertisements via fax to obtain express

18  written consent from fax recipients.  <u>Id</u>. at 2.  In response to industry concerns regarding the

19  proposed rule, the FCC stayed the rule until 2005.  <u>Id</u>. at 4.

20      In 2005, citing enormous compliance costs for the industry and over a decade of reliance

21  on the FCC's EBR exemption for junk faxes, Congress codified the EBR exemption for

22  unsolicited advertisements sent by fax.  <u>Id</u>. at 5.  Congress passed the JFPA because of its

23  explicit concern that the FCC "may not choose to reverse its new [2003] rule removing the EBR

24  exception from the general ban on sending unsolicited facsimile advertisements."  <u>Id</u> at 6.  Thus,

25  the legislative history shows that Congress intervened to keep the EBR exemption for junk faxes

26  when the FCC had decided to repeal it.  Since the FCC had taken no steps to repeal its EBR

27  ORDER GRANTING IN PART DEFENDANT'S
   MOTION FOR SUMMARY JUDGMENT          - 7 -

28

1   exemption for commercial telephone calls, there would have been no reason for Congress to

2   codify or restate the existing EBR exemption for commercial telephone calls in 2005.  It is also

3   worth noting that when Congress passed the JFPA, the FCC had already had its EBR exemption

4   for commercial telephone calls in place for over a decade.  Since Congress' subsequent

5   amendment to the TCPA neither disturbed the FCC's authority nor displaced its EBR exemption

6   for commercial telephone calls, one can infer that the FCC correctly understood congressional

7   intent with regard to commercial telephone calls.  See North Haven Bd. of Ed. v. Bell, 456 U.S.

8   512, 535 (1982) (quoting U.S. v. Rutherford, 442 U.S. 544, 554, n.10 (1979)).

9       Based on the foregoing, the Court finds that Congress did not intend to bar the FCC from

10  creating an EBR exemption for commercial telephone calls.  To the contrary, the JFPA's

11  legislative history suggests that Congress was so concerned about the consequences of losing the

12  EBR exemption that it took stops to protect the exemption from further FCC action.

13              **4. Defendant's Calls and the EBR Exemption**

14      Defendant argues that plaintiff's TCPA claim fails as a matter of law because its calls to

15  plaintiff were permissible under the EBR exemption.  Defendant bears the burden of

16  demonstrating that its conduct falls clearly within the exemption.  Rheem Mfg. Co. v. Rheem,

17  295 F.2d 473, 475 (9th Cir. 1961).

18      It is undisputed that plaintiff purchased items from defendant's retail stores on more than

19  one occasion.  Plaintiff does not recall giving defendant his telephone number, but affirms that if

20  he had given a telephone number to a retailer, the number called by defendant is the number he

21  would have given.  Defendant asserts that its call list includes only telephone numbers

22  voluntarily given by patrons of its retail stores and website and that defendant does not collect

23  telephone numbers from other sources.  The calls to plaintiff from defendant did not begin until

24  after plaintiff purchased merchandise at one of defendant's retail locations, and they occurred

25  within 18 months following plaintiff's last purchase at one of defendant's retail stores.  There is

26  no evidence that plaintiff terminated his relationship with defendant.

27  ORDER GRANTING IN PART DEFENDANT'S
    MOTION FOR SUMMARY JUDGMENT          - 8 -

28

1    Upon these facts, the Court finds that plaintiff and defendant's relationship falls within

2    the EBR exemption to the TCPA. The Court therefore GRANTS defendant's motion for

3    summary judgment with regard to plaintiff's TCPA claim.

4    **B. Washington Automatic Dialing and Answering Devices Act, RCW 80.36.400**

5    Plaintiff claims that defendant violated the Washington Automatic Dialing and

6    Announcing Devices Act ("WADAD") by using an automatic dialing and announcing device

7    ("ADAD") to contact him at his residence. Under the WADAD, "[n]o person may use an

8    automatic dialing and announcing device for purposes of commercial solicitation." RCW

9    80.36.400(2). The WADAD does not contain an exemption for entities sharing an established

10   business relationship. Any violation of the WADAD is a *per se* violation of Washington's

11   Consumer Protection Act. RCW 80.36.400(3).

12   Defendant argues that the WADAD does not apply to the calls at issue here because the

13   calls originated outside of Washington State. Defendant further argues that the WADAD is

14   expressly or implicitly preempted by the TCPA. Lastly, defendant contends that, even if the

15   WADAD does apply and is not preempted, plaintiff's consent to defendant's calls precludes

16   liability.

17   **1. State Jurisdiction Over Interstate Communications**

18   Defendant argues that states do not have jurisdiction over interstate telephone calls and

19   that, since defendant's calls crossed state lines, the WADAD does not apply. The bright line

20   rule for which defendant argues is too broad. The Federal Communications Act of 1934

21   ("FCA") grants general authority over interstate telecommunications to the FCC. 47 U.S.C.

22   § 151. The line between intrastate and interstate communications and the jurisdictional divide

23   between federal and state authority are not always clear, however. The U.S. Supreme Court has

24   noted:

25   [W]hile the [FCA] would seem to divide the world of domestic telephone service

26   neatly into two hemispheres – one comprised of interstate service, over which the

27   ORDER GRANTING IN PART DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT          - 9 -

28

1

2
> FCC would have plenary authority, and the other made up of intrastate service,
> over which the States would retain exclusive jurisdiction – in practice, the realities
> of technology and economics belie such a clean parceling of responsibility.  This is
> so because virtually all telephone plant that is used to provide intrastate service is
> also used to provide interstate service, and is thus conceivably within the
> jurisdiction of both state and federal authorities.

3

4

5

6
La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 360 (1986).  Even when the communications at

7
issue are clearly interstate, there are "exceptions to the general proclamation that interstate

8
telecommunications are committed to the FCC's jurisdiction alone."  Chamber of Commerce of

9
the U.S.A. v. Lockyer, No. 2:05CV2257(MCEKJM), 2006 WL 462482, at *5-6 (E.D. Cal. Feb.

10
27, 2006).  Under 47 U.S.C. § 253(b), the FCA expressly reserves to the states the right to

11
"impose . . . requirements necessary to . . . protect the public safety and welfare . . . and

12
safeguard the rights of consumers."  States are also permitted to regulate many of the terms and

13
conditions of commercial mobile service pursuant to 47 U.S.C. § 332(c)(3)(A).

14
    Prior to the enactment of the TCPA, State Attorneys General had for many years pursued

15
out-of-state offenders who utilized interstate telecommunications to violate state consumer

16
protection laws.  These consumer protection suits continue today.  See Letter from the Nat'l

17
Ass'n of Attorneys Gen. to Marlene Dortch, Sec'y of the FCC, CG Dkt. No. 02-278 (July 29,

18
2005).  The FCC has also recognized that states have a role to play in enforcing the do-not-call

19
laws:  in that context, states have "historically enforced their own state statutes within, as well as

20
across[,] state lines."  Rules and Regulations Implementing the Telephone Consumer Protection

21
Act (TCPA) of 1991, 68 Fed. Reg. at 44155.

22
    Thus, the FCA, the FCC, and the states all acknowledge that states may, in certain

23
circumstances, regulate interstate telecommunications.  The Court therefore finds that

24
defendant's blanket assertion that state law does not apply to interstate calls is too broad.

25
## 2. Preemption

26
    Congress has the power to preempt state law and may do so explicitly or implicitly.

27
ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          - 10 -

28

1  Whistler Invs., Inc. v. Depository Trust & Clearing Corp., 539 F.3d 1159, 1168 (9th Cir. 2008).

2  Defendant argues that the TCPA preempts the WADAD to the extent it regulates interstate calls

3  because (a) the TCPA expressly preempts state regulation of interstate communications (Reply

4  at 9) and (b) the WADAD conflicts with "congressional purposes in regulating and fostering

5  interstate commerce" (Motion at 8-9).[1]

6  **a. Presumption Against Preemption**

7  "In all pre-emption cases, and particularly in those in which Congress has legislated . . . in

8  a field which the States have traditionally occupied, . . . we start with the assumption that the

9  historic police powers of the States were not to be superseded by the Federal Act unless that was

10  the clear and manifest purpose of Congress." Wyeth v. Levine, ___ U.S. ___, 129 S. Ct. 1187,

11  1194-95 (2009) (internal quotation marks and citations omitted).  Courts assume that Congress

12  does not intend to abrogate state power because the states are "independent sovereigns in our

13  federal system" whose laws should not be cavalierly pre-empted.  Id. at 1195 n.3 (quoting

14  Medtronic, Inc. v. Lohr, 518 U.S. 470,  485 (1996)).  Defendant argues that the presumption

15  against preemption does not apply in this case because there has long been a federal presence in

16  the area of interstate telecommunications.  See Ting v. AT&T, 319 F.3d 1126, 1136 (9th Cir.

17  2003).  The same argument was rejected in Wyeth, however.  The Supreme Court found that the

18  existence of federal regulation in an area does not abrogate the presumption against preemption:

19  it is the historic presence of state regulation that is acknowledged and preserved by the

20  presumption, regardless of the co-existence or absence of federal regulation.  Id.

21  State consumer protection laws arise under a state's traditional police powers (Chae v.

22  SLM Corp., 593 F.3d 936, 944 (9th Cir. 2010)), and the WADAD is an express consumer

23  

24  [1] Both parties have engaged in practices of which the Court does not approve.  Plaintiff presented arguments in a declaration of counsel, thereby avoiding the page limits set forth in Local Civil

25  Rule 7(e)(3).  Defendant presented a new argument in reply to which plaintiff did not have an opportunity to respond in writing.  Because oral argument was heard and the preemption issues raised

26  are significant, the Court has considered all of the evidence presented.

27  ORDER GRANTING IN PART DEFENDANT'S

28  MOTION FOR SUMMARY JUDGMENT        - 11 -

1  protection law (RCW 80.36.400(3)).  Mindful of the states' historic presence in the area of

2  consumer protection, the Court declines to abandon the traditional presumption against

3  preemption.

4              **b.  Express Preemption**

5       Defendant argues that Congress expressly preempted all state laws that impose additional

6  requirements on interstate telecommunications.  The provision on which this argument is based

7  reads:

8       (e) Effect on State law

9           (1) State law not preempted

10

11              Except for the standards prescribed under subsection (d) of this section and
                subject to paragraph (2) of this subsection, nothing in this section or in the

12              regulations prescribed under this section shall preempt any State law that
                imposes more restrictive intrastate requirements or regulations on, or which

13              prohibits–

14
                (A) the use of telephone facsimile machines or other electronic devices to
15                  send unsolicited advertisements;

16
                (B) the use of automatic telephone dialing systems;
17

18              (C) the use of artificial or prerecorded voice messages; or

19              (D) the making of telephone solicitations.

20  47 U.S.C. § 227(e).  "Pre-emption fundamentally is a question of congressional intent, and when

21  Congress has made its intent known through explicit statutory language, the courts' task is an

22  easy one."  English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990).  Normal principles of statutory

23  construction govern the interpretation of the savings provision.  Lujan-Armendariz v. INS, 222

24  F.3d 728, 749 (9th Cir. 2000).  The "starting point for interpreting a statute is the language of the

25  statute itself" (Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 56

26

27  ORDER GRANTING IN PART DEFENDANT'S
    MOTION FOR SUMMARY JUDGMENT            - 12 -
28

1  (1987)), giving the words "their ordinary, contemporary, common meaning" (United States v.

2  Smith, 155 F.3d 1051, 1057 (9th Cir. 1998)).

3                                  **i. Statutory Language**

4          Defendant argues that the word "intrastate" in the opening paragraph of § 227(e) shows

5  that Congress intended to preempt any state regulations that apply to interstate

6  telecommunications.  Because the WADAD prohibits the use of automatic dialing and

7  announcing devices for purposes of commercial solicitation, regardless of whether the call

8  originates within or outside Washington, defendant argues that it is expressly preempted by

9  § 227(e).  Courts that have interpreted the TCPA's savings clause have come to different

10  conclusions.  A few courts agree with defendant and interpret the savings clause in such a way

11  that the word "intrastate" modifies "requirements," "regulations," and "which prohibits."  See

12  Lockyer, 2006 WL 462482, at *8; Charvat v. Teleytics, LLC, No. 05AP-1259, 2006 WL

13  2574019, at *10 (Ohio Ct. App. Aug. 31, 2006).  A majority of the courts has read the word

14  "intrastate" to modify only "requirements" and "regulations," leaving state laws which prohibit

15  the conduct listed in subsections (A) through (D) intact, regardless of whether they regulate

16  intra- or interstate conduct.  See Palmer v. Sprint Nextel Corp., No. C09-1211JLR, 2009 WL

17  4730851, at *6 (W.D. Wash. Dec. 7, 2009); U.S. v. Dish Network, LLC, 667 F. Supp.2d 952,

18  963-64 (C.D. Ill. 2009); Stenejhem v. Freeeats.com, Inc., 712 N.W.2d 828, 834 (N. D. Apr. 21,

19  2006).  Some courts have determined, based in part on this split in authority, that the savings

20  clause is ambiguous.  See Williams v. MCIMetro Access Transmission Servs. LLC, No. C08-

21  0082TSZ (W.D. Wash. Nov. 17, 2008).  And at least one court has found that the savings clause

22  does not expressly preempt any state regulation since its avowed purpose is simply to save

23  certain state laws from preemption.  Van Bergen v. State of Minnesota, 59 F.3d 1541, 1548 (8th

24  Cir. 1995).

25          Having reviewed the statutory language, the relevant case law, and the arguments

26  of counsel, and keeping in mind the presumption against preemption, the Court finds that the

27  ORDER GRANTING IN PART DEFENDANT'S
    MOTION FOR SUMMARY JUDGMENT            - 13 -

28

1    language and grammatical constructs of § 227(e) do not reveal a congressional intent to preempt

2    state laws prohibiting interstate use of automated dialing and announcing devices.  Read

3    logically and grammatically, § 227(e) expressly saves from preemption two distinct and

4    independent categories of state law, namely any state law (1) "that imposes more restrictive

5    intrastate requirements or regulations on . . . the use of automatic telephone dialing systems" and

6    any state law (2) "which prohibits . . . the use of automatic telephone dialing systems."  "That

7    imposes" and "which prohibits" are parallel constructions introducing the two kinds of state laws

8    that are not preempted.  The word "intrastate" in the first clause is an adjective that can modify

9    only "requirements" and "regulations."  "Intrastate" cannot, under any stretch of grammar or

10   common usage, modify "which prohibits."  Thus, state laws prohibiting the use of automatic

11   telephone dialing systems, such as the WADAD, are expressly saved from preemption.

12        The interpretation adopted by the <u>Lockyer</u> court does not comport with the rules of

13   statutory construction.  The interpretation improperly converts the phrase "which prohibits" into

14   a noun, such as "prohibition," so that the adjective "intrastate" can be applied to the judicially-

15   created list "requirements or regulations or prohibitions."  (This judicial revision also requires

16   the relocation of the preposition "on.")  If "which prohibits" is not converted into a noun,

17   applying "intrastate" as the <u>Lockyer</u> court suggests gives rise to the following nonsensical

18   statement:  "nothing in this section . . . shall preempt any state law that imposes more restrictive

19   intrastate which prohibits the use of automatic telephone dialing systems."  Because "the most

20   powerful safeguard for the courts' adherence to their constitutional role of construing, rather

21   than writing, statutes is to rely on the statute's plain language," the Court declines to rewrite or

22   impose an illogical construction on the savings clause.  <u>U.S. v. Vidal</u>, 504 F.3d 1072, 1083 (9th

23   Cir. 2007) (quoting <u>Med. Bd. of Cal. v. Super. Ct.</u>, 106 Cal. Rptr.2d 381, 390 (Ct. App. 2001)).

### ii.  Purposes of the Statute

25        "If necessary to discern Congress's intent, [the Court] may read statutory terms in light of

26   the purposes of the statute."  <u>The Wilderness Society v. U.S. Fish & Wildlife Serv.</u>, 353 F.3d

27   ORDER GRANTING IN PART DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT            - 14 -

28

1    1051, 1060 (9th Cir. 2003).  Because the savings clause unambiguously identifies the categories

2    of state law that are not preempted by the TCPA, resort to "the purposes of the statute" is

3    unnecessary.  Nevertheless, consideration of the overall purpose and structure of the statutory

4    scheme does not alter the Court's determination that the TCPA does not expressly preempt state

5    prohibitions on the use of automatic telephone dialing systems.

6          When it enacted the TCPA in 1991, Congress was responding to the significant increase

7    in the use of the telephone to market goods and services that had left "[m]any customers . . .

8    outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers."

9    Congressional Statement of Findings, § 2 of Pub. L. 102-243.  The legislative history shows that

10   Congress was concerned that state laws regulating telemarketing could be evaded through

11   interstate operations.  Id.  Defendant tries to convert this concern into a bar on state regulation of

12   interstate calls.  Reply at 10.  There is no reason to presume that Congress intended to kill

13   existing state regulations and supplant them with the TCPA.  The primary purpose of the TCPA

14   was to ban automated or prerecorded telephone calls to a home (absent consent from the

15   recipient or a health and safety justification) as "the only effective means of protecting telephone

16   consumers from this nuisance and privacy invasion."  Congressional Statement of Findings, § 2

17   of Pub. L. 102-243.  Through the savings clause, Congress expressly excluded from preemption

18   certain categories of state law that accomplish the same goal.  Neither the purposes nor the

19   structure of the TCPA supports a finding of express preemption of the WADAD.

20                    **c.  Conflict Preemption**

21         In its opening memorandum, defendant appeared to concede that there is no clear

22   statutory language in the TCPA barring state regulation of interstate telecommunications and

23   instead relied on a theory of implied preemption.  Defendant argues that the WADAD is

24

25

26

27   ORDER GRANTING IN PART DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT          - 15 -
28

1  preempted to the extent that the state law actually conflicts with the TCPA.[2]  A claim of conflict

2  preemption requires an examination of "the federal statute as a whole to determine whether a

3  party's compliance with both federal and state requirements is possible or whether, in light of the

4  federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment

5  of Congress's objectives."  Whistler Invs., 539 F.3d at 1166.

### i. Impossibility

7      Defendant suggests, without actually arguing, that compliance with both the federal and

8  state requirements regarding the use of automated dialing and announcing devices is impossible,

9  thereby triggering conflict preemption.  Motion at 13.  Defendant has not, however,

10 demonstrated that compliance with the stricter WADAD requirements would make it impossible

11 to comply with the TCPA in the circumstances presented here.  In fact, compliance with the

12 WADAD requirements would virtually ensure compliance with the TCPA restrictions.  A

13 finding of preemption is not compelled by physical impossibility.

### ii. The WADAD as an Obstacle to Congressional Purposes

15     "A state law is impliedly preempted where it stands as an obstacle to the accomplishment

16 and execution of the full purposes and objectives of Congress."  Laster v. AT&T Mobility LLC,

17 584 F.3d 849, 857 (9th Cir. 2009) (internal quotation marks omitted).  To determine whether a

18 state law obstructs a federal statute, the Court must first identify the purposes and objectives of

19 the statute.  Id.  Defendant argues that "Congress' purpose . . . was to retain the established

20 business relationship exception."  Motion at 11 (quoting Lockyer, 2006 WL 462482, at *8).

21

22  _____

      [2]  Defendant does not argue that Congress so thoroughly occupied the field of interstate
telecommunications as to leave no room for states to regulate in that area.  As noted above, Congress
23 was willing to allow states to regulate some terms and conditions of interstate mobile service and to
enforce consumer protection laws in the area of telecommunications.  Recent changes to the FCA have
24 created an increasing role for states in regulating interstate communications.  See Ting v. AT&T, 319
F.3d 1126, 1136-37 (9th Cir. 2003).  In addition, the TCPA savings clause makes clear that Congress
25 did not intend to preclude all state regulation of automated dialing and announcing devices.  Field
preemption is therefore not an issue in this case.  See ErieNet, Inc. v. Velocity Net, Inc., 156 F.3d 513,
26 515 (3rd Cir. 1998); Stenehjem v. Freeeats.com, Inc., 712 N.W.2d 828, 839 (N.D. 2006).

27  ORDER GRANTING IN PART DEFENDANT'S
28  MOTION FOR SUMMARY JUDGMENT          - 16 -

1    This argument is fallacious. When it enacted the TCPA in 1991, Congress made no provisions

2 for existing business relationships. As noted above, the primary purpose of the TCPA was to

3 protect telephone consumers from nuisance and invasion of privacy by banning most automated

4 or prerecorded telephone calls to the home. Congressional Statement of Findings, § 2 of Pub. L.

5 102-243. Although the FCC was granted the flexibility to determine whether additional types of

6 automated or prerecorded calls should be permitted, the key consideration was whether

7 consumers would consider the calls a nuisance or an invasion of their privacy.[3] The WADAD's

8

9     [3] In enacting the TCPA, Congress found that:

10    (1) The use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques.

11    (2) Over 30,000 businesses actively telemarket goods and services to business and residential customers.

12    (3) More than 300,000 solicitors call more than 18,000,000 Americans every day.

   (4) Total United States sales generated through telemarketing amounted to $435,000,000,000 in

13       1990, a more than four-fold increase since 1984.

14    (5) Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

15    (6) Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.

16    (7) Over half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operation; therefore,

17       Federal law is needed to control residential telemarketing practices.

   (8) The Constitution does not prohibit restrictions on commercial telemarketing solicitations.

18    (9) Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits

19       legitimate telemarketing practices.

20    (10) Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.

21    (11) Technologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the

22       consumer.

23    (12) Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective

24       means of protecting telephone consumers from this nuisance and privacy invasion.

25    (13) While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal

26       Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance

27 ORDER GRANTING IN PART DEFENDANT'S

28 MOTION FOR SUMMARY JUDGMENT      - 17 -

1  prohibition of unsolicited commercial calls made with an automated dialing and announcing

2  device in no way impedes the stated purposes of Congress.

3      Defendant argues that the President who signed the TCPA purportedly did so because it

4  authorized the FCC to adopt regulations protecting legitimate business interests, including the

5  ability to contact consumers with whom the business had a preexisting business relationship.

6  Signing Statement, P.L. 102-243, "Statement by President George Bush Upon Signing S. 1462"

7  (Dec. 23, 1991).  The Court will assume, for purposes of this motion, that the President's signing

8  statement is probative of legislative intent.[4]  Both Congress and the President contemplated that

9  there might be forms of communication other than those for which prior consent had been

10 obtained and those which conveyed emergency health and safety information that should be

11 permitted under the TCPA.  The FCC was expressly authorized to evaluate and regulate such

12 communications.  Congress did not, however, limit the states' regulatory authority in this area

13 other than as expressly stated in § 227(e).  The fact that certain communications would not,

14 under FCC regulations, violate the TCPA does not suggest that Congress intended to abrogate

15 more restrictive state laws or that such laws would be in actual conflict with the federal scheme.

16      **d.  Agency Preemption**

17 ───────────────

18         or invasion of privacy, or for noncommercial calls, consistent with the free speech
           protections embodied in the First Amendment of the Constitution.

19     (14)  Businesses also have complained to the Congress and the Federal Communications
           Commission that automated or prerecorded telephone calls are a nuisance, are an invasion
20         of privacy, and interfere with interstate commerce.

21     (15)  The Federal Communications Commission should consider adopting reasonable restrictions
           on automated or prerecorded calls to businesses as well as to the home, consistent with
           the constitutional protections of free speech.

22 Congressional Statement of Findings, § 2, Pub. L. 102-243.

23      [4]  This assumption is doubtful.  "It is, emphatically, the province and duty of the judicial
24 department, to say what the law is."  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).  In our
   system of government, the Congress makes the laws, the judiciary interprets them, and the President
25 enforces them.  Allowing the President to determine what a law means when adding his signature to a
   completed piece of legislation imperils the constitutionally-mandated roles of both Congress and the
26 judiciary.  See Estate of Reynolds v. Martin, 985 F.2d 470, 477 n.8 (9th Cir. 1993).

27 ORDER GRANTING IN PART DEFENDANT'S
28 MOTION FOR SUMMARY JUDGMENT         - 18 -

1    "Pre-emption may result not only from action taken by Congress itself; a federal agency

2    acting within the scope of its congressionally delegated authority may pre-empt state

3    regulation." La. Pub. Serv. Comm'n., 476 U.S. at 369.  Defendant relies on statements made by

4    the FCC in 2003 for two purposes:  (1) to show that Congress intended to promote a uniform

5    regulatory scheme governing telemarketing when it enacted the TCPA in 1991; and (2) as proof

6    that the agency has determined that statutes such as the WADAD are preempted.  Neither

7    argument is persuasive.

8        In September of 2002, more than a decade after the TCPA was enacted, the FCC sought

9    comment on a variety of statutory issues, including preemption of state law.[5]  See Notice of

10   Proposed Rulemaking and Memorandum Opinion and Order, 17 F.C.C.R. at 17487.  Defendant

11   does not explain how this rule-making process could possibly reflect congressional intent in

12   1991 or otherwise define the purposes and objectives of the statute.  Nor is there any indication

13   that Congress delegated to the FCC authority to preempt state laws that would otherwise fall

14   within the savings provision of § 227(e).  Thus, even if the FCC had adopted a regulation

15   explicitly preempting all state laws affecting interstate telecommunications, its validity would be

16   suspect:  where Congress clearly authorized states to prohibit the use of automated telephone

17   dialing and announcing systems, the Court may not defer to the agency's contrary interpretation

18   of the statute.  See The Wilderness Society, 353 F.3d at 1061 (citing Medtronic, 518 U.S. at

19   512).

20       In this case, the FCC did not actually issue regulations – or even a final decision –

21   regarding the preemptive effects of the TCPA that might be entitled to deference.  The 2002-

22

23       [5]  The FCC issued a Notice of Proposed Rulemaking in 1992 related to the original enactment of
24   the TCPA in 1991, but did not specifically address the issue of state law preemption.  See generally
     Notice of Proposed Rulemaking, 7 F.C.C.R. 2736 (1992).  The FCC's rules, issued in 1992, only briefly
25   express the FCC's interpretation of § 227(e), do not interpret the "or which prohibits" clause, and do not
     state whether that prohibitory clause applies to both intrastate and interstate calls.  See Rules and
26   Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 F.C.C.R. at 8780-81.

27   ORDER GRANTING IN PART DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT        - 19 -
28

2003 rulemaking process involved the interplay between state and federal do-not-call regulations. See Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991, 68 Fed. Reg. at 44154-55. The FCC concluded that, "by operation of general conflict preemption law, the federal rules constitute a floor [which] would supersede all less restrictive state do-not-call rules" and acknowledged that "states may adopt more restrictive do-not-call laws governing intrastate telemarketing." Id. at 44155. The FCC did not come to a final conclusion regarding more restrictive state do-not-call laws and their application to interstate calls. Id. at 44155. Instead the FCC found that § 227(e) was ambiguous as to whether states can prohibit certain types of interstate calls and chose to "caution that more restrictive state efforts to regulate interstate calling would almost certainly conflict with [FCC] rules." Id.

> The record in this proceeding supports the finding that application of inconsistent rules for those that telemarket on a nationwide or multi-state basis creates a substantial compliance burden for those entities . . . We therefore believe that any state regulation of interstate telemarketing calls that differs from our rules almost certainly would be preempted. We will consider any alleged conflicts between state and federal requirements and the need for preemption on a case-by-case basis. Accordingly, any party that believes a state law is inconsistent with section 227 or our rules may seek a declaratory ruling from the Commission.

Id.[6] The FCC has received many requests for declaratory rulings on the issue of preemption. In 2005, a group of telemarketers petitioned the FCC to declare that only the FCC, not the states, has the authority to regulate telephone calls that cross state lines. Petition for Declaratory Ruling, CG Docket No. 02-278 (Apr. 29, 2005). The FCC combined this petition with five other requests for declaratory ruling that were then pending before the agency and reopened the public comment period. In the Matter of Rules and Regulations Implementing the Telephone

---

[6]   The agency's reluctance to invalidate all state restrictions on the ground that they would impose burdensome compliance costs and/or subject telemarketers to conflicting regulations was appropriate. An analysis of the facts and legal obligations involved in this case, for example, reveals that compliance with both the federal and state regulations is not only possible, but relatively easy. Congress has authorized states to prohibit, rather than restrict or regulate, the use of automatic dialing and announcing devices. Thus, a telemarketing firm merely has to identify and exclude from its list of phone numbers those that start with Washington area codes to comply with all applicable laws.

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          - 20 -

Consumer Protection Act of 1991, CG Dkt. No. 02-278 (May 13, 2005).  The National

Association of Attorneys General stepped into the fray, arguing that the telemarketers' request

was startling given the virtually universal acknowledgment that states have enforced consumer

protection laws against interstate callers both before and after the enactment of the FCA and the

TCPA.  Letter from the Nat'l Ass'n of Attorneys Gen., CG Dkt. No. 02-278.  Despite its promise

to determine the need for preemption on a case-by-case basis, the FCC has not ruled on any of

the pending petitions.

At most, the FCC has hypothesized that state laws regulating interstate

telecommunication "would almost certainly" conflict with FCC regulations.  No finding of

preemption has yet been made, however.  Nor has the FCC provided an "informed

determination[] about how state requirements may pose an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress" from which the Court could infer

preemption.  Wyeth, 129 S.Ct. at 1202 (internal quotation marks omitted).  Absent a definitive

ruling on the preemption issue, the Court need not defer to the agency's musings.

The presumption against preemption, the express language of the savings clause, the

stated objectives of the TCPA, and the fact that the FCC has declined to issue a definitive ruling

all support the finding that state prohibitions on the use of automated telephone dialing and

announcing systems are not preempted.  "The case for federal pre-emption is particularly weak

where [as here] Congress has indicated its awareness of the operation of state law in a field of

federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever

tension there [is] between them."  Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141,

166-67 (1989) (internal quotation marks omitted).  For all of the foregoing reasons, the Court

finds that Congress did not intend to preempt state laws prohibiting the acts set forth in

§ 227(e)(1)(A)-(D).

### 3. Consent under the WADAD

The WADAD flatly prohibits the use of ADADs in commercial solicitation.  See RCW

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          - 21 -

80.36.400(2); WAC 480-120-253(3).  There is no dispute that plaintiff received telephone

solicitations through an ADAD.  The primary issue is whether defendant's calls constituted

"commercial solicitation" within the context of the WADAD.  "Commercial solicitation means

the unsolicited initiation of a telephone conversation for the purpose of encouraging a person to

purchase property, goods, or services."  RCW 80.36.400(1)(b).  The WADAD does not define

the term "unsolicited," and Washington courts have not yet interpreted its meaning within the

context of the statute.  Legislative history regarding the WADAD is not informative on the issue.

Given the lack of guidance on the meaning of "unsolicited," the Court may look to the

interpretation given to parallel federal statutes.  Beal v. City of Seattle, 134 Wn.2d 769, 777

(1998).  Defendant argues that the Court should adopt the FCC's interpretation of "prior express

invitation or permission" as used in the TCPA, suggesting that a call is not "unsolicited" if the

recipient has consented or if an established business relationship exists.  The federal and state

statutes are not sufficiently similar for the Court to incorporate TCPA definitions into the

WADAD, however.  The common, ordinary meaning of the word "unsolicited" is "not asked

for" or "not requested."  While express consent by the recipient may constitute a request, there is

no reason to assume that the Washington legislature intended to expand the universe of

permissible calls to incorporate an EBR exemption.  The plain language of the WADAD flatly

prohibits the use of ADADs in commercial solicitation.  See RCW 80.36.400(2); WAC 480-120-

253(3).  In contrast, the TCPA expressly permits certain automated calls (47 U.S.C.

§ 227(b)(1)(A)) and gives explicit authority to the FCC to define additional exemptions (47

U.S.C. § 227(b)(1)(B)).  The sole purpose of the WADAD is consumer protection.  See RCW

80.36.400(3).  In contrast, Congress authorized the FCC to take into consideration legitimate

business interests as well as citizen privacy when issuing regulations under the TCPA.  See

Congressional Statement of Findings, § 2 of Pub. L. 102-243.  Given the restrictive nature of the

WADAD, the Court is not convinced that "unsolicited" has the same meaning as "prior express

invitation or permission."  The common, ordinary meaning will therefore apply.

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT              - 22 -

1       Plaintiff contends that he did not give defendant consent to call him at home.  While the

2   Court has found that plaintiff voluntarily gave his telephone number to defendant, defendant has

3   not established that plaintiff gave his consent to be contacted for purposes of a commercial

4   solicitation.  Defendant has not identified the sales associate who requested plaintiff's telephone

5   number or what plaintiff was told about the use of his telephone number at the time it was

6   collected.  Although defendant has a policy requiring sales associates to read to customers a

7   specific script designed to elicit consent to commercial solicitations, plaintiff has demonstrated

8   that sales associates routinely deviate from or ignore the script.  Defendant has not, therefore,

9   demonstrated that plaintiff solicited the calls he received from defendant for purposes of the

10  WADAD.

## CONCLUSION

12      For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART

13  plaintiffs' motion for summary judgment.  Plaintiff's claim under the TCPA is hereby dismissed.

14  Plaintiff may, however, pursue his claim under the WADAD.

    Dated this 7th day of April, 2010.

Robert S.  Lasnik
United States District Judge

ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT           - 23 -